AARON KING, Administrator of Benjamin King, dec'd, *v.* MARIA KING et al.

1. In a suit by the administrator of a deceased obligee to foreclose a bond and mortgage, and the defence of payment set up, a brother of the deceased, entitled to a distributive share of his personal estate, is not a competent witness for the complainant.

2. To render him competent, he should release all his interest in the bond and mortgage, and the administrator should release him, or his interest in the estate, from all liability, on account of the costs of the suit.

3. Nor would he be competent to prove the execution of such releases where they are attested by a subscribing witness; a release of this kind must be regularly proved the same as any other deed.

4. In such a suit, against the widow and heirs of the deceased obligor, they can claim, as a payment of the bond, an account of the obligor against the obligee for board furnished him under an agreement that it should be applied in reduction of the bond, and such agreement need not be expressly proved, but may be inferred from circumstances.

5. Such agreement need not be proved as set out in the answer; the substance only of the issue need be proved, nor is the same degree of accuracy required in an answer as in a bill.

6. An allegation of payment in chancery pleadings is sustained by proof of satisfaction in any way, as by set-off, award and satisfaction, &c.

7. The statute of limitations is no bar to such a defence, although more than six years had elapsed after most of the account had accrued; nor the statute against frauds and perjuries, on the ground that the agreement was not to be performed in one year from the making thereof.

This cause was heard before the Chancellor at February Term, 1852, upon the bill, answer, replication and proofs. The nature of the pleadings and the facts sufficiently appear in the Chancellor's opinion.

*Messrs. J. B. Dayton* and *Browning,* for complainant.

*Mr. T. W. Mulford,* for defendant.

THE CHANCELLOR. This bill is filed by the complainant as the administrator of the estate of Benjamin King, deceased,

for the foreclosure of a mortgage made and executed to Benjamin King by Samuel King, his brother. The mortgage was made to secure the payment of twelve hundred dollars and interest, payable in one year from the sixth day of April, 1839, the date of the mortgage and accompanying bond.

Samuel King, the mortgagor, is likewise deceased, and the defendants in this suit are Maria King, his widow; Robert King, Adeline King, Benjamin F. King, and Rebecca King, infants, the children and heirs-at-law of the said Samuel. The payment of three hundred dollars of the principal, and of the interest up to April 6th, 1840, is admitted.

All the defendants have answered by one joint and several answer. They insist that there is nothing due on the bond and mortgage, and that the debt was paid and satisfied in this wise: that Benjamin King boarded with his brother Samuel, and was furnished with boarding, washing and lodging, from the fifth day of September, 1839, to the first day of January, 1847, at the price of three dollars a week, under an agreement between them, that the said board, lodging and washing should be furnished and received on account, and in payment of the debt due on the bond and mortgage, and that Benjamin King would permit and allow the same as a set-off in payment and discharge of the said debt.

Witnesses have been examined on both sides, and the cause is submitted upon the pleadings and proofs.

The most material witness examined on behalf of the complainant is Peter King. He was objected to as an incompetent witness, when called before the master, and the objection was insisted on in the argument of the cause. Is he a competent witness?

The witness is a brother of the complainant, and of Benjamin King, the intestate, upon whose estate the complainant has administered. He is entitled, as one of the next of kin, to one-third of the distributive personal estate of his deceased brother. The estate is solvent, and the witness' interest in it, independent of this bond and mortgage, will be about one thousand dollars. The witness, therefore, is directly interested in the result of this suit. He will gain

or lose one-third of the money recovered or lost by it. The witness was objected to before the master. Two releases were then produced—one executed by the witness to Aaron King, the complainant, not as administrator, but in his own right, releasing to him all the right and interest of the witness in the bond and mortgage in this suit. The other release was from Aaron King, the complainant, in his individual capacity, to his brother, the witness. To render this witness competent, it was necessary that the complainant, as administrator, should have released him, or his interest in the estate, from all liability for and on account of any part of the costs of this suit; for, if the suit is lost, the distributive share of Peter King will be chargeable, with a proportion of the costs and expenses. The release of Aaron King, in his individual right, of this liability, amounts to nothing. Peter King can never set it up in bar to any claim the administrator may make for his proportion of the expenses.

But, further, the releases were proved by the witness himself, and were then offered in evidence to render him competent. The defendants' counsel objected to them, and the objection was well taken. The releases are witnessed by James B. Dayton, and he should have been called to prove their execution.

The witness was not sworn on his *voir dire*, at the request of the defendants, but was sworn on behalf of the complainant. It was not competent to prove the execution of the releases by him. The subscribing witness was then before the master, and no reason is given why he was not called upon. The release must be regularly proved, as any other deed. 1 *Barb. Ch. Prac.* 267; *Botham* v. *Stringler*, 1 *Esp. Rep.* 165; *Butchers' Co.* v. *Jones,* *Ib.* 161; *Corking* v. *Gerard*, 1 *Camp.* 37.

These are not mere technical objections, but are substantial and reasonable, and the court has no right to disregard them when they are insisted on by the party who makes them.

The account which the witness gives of these releases is very unsatisfactory. No consideration whatever passed be-

tween his brother and himself. He has received from his brother quite, if not all, the amount coming to him from the estate, for which his brother holds his notes and receipts. He says his brother told him if he would execute the release, he would take it for the money he owed him. And yet he at the same time says that his brother still holds these notes against him, and he expects to pay his brother the money as fast as he gets it.

In deciding this case, I must lay entirely out of view the evidence given by Peter King.

Let us now examine the defence as to its legality, and how far it is established by the evidence.

The complainant insists that there can be no set-off in this suit of any debt due for board, or otherwise, from Benjamin King to Samuel King. It is undoubtedly correct that there can be nothing like a legal set-off. These defendants can bring no suit against Benjamin's administrator for any debt Benjamin might have owed his brother. No set-off can be allowed, unless the debt or claim is such that the party may maintain a counter action for it. To permit the heirs-at-law, in a suit against them by the administrator of an estate, to set off a debt due their ancestor from the intestate, would be to change the course of distribution. Whatever debt may be due from Benjamin King's estate to that of Samuel's, it can be claimed only by the personal representative of Samuel King. He only can bring suit for it, and consequently he only can claim the benefit of it as an off-set.

But these defendants do not claim any allowance by way of legal set-off. They do not set up a claim of Samuel against Benjamin King of an independent, legal debt due from the latter to the former. They claim in equity, a credit on this debt, the payment of which the complainant is enforcing, for services which were rendered to the complainant's intestate, not independent of, but in reference to this very debt, and under an agreement, either expressed or implied in law, that they should be applied to its reduction.

A defence like this would be good at law, independent of the statute respecting mutual dealers, and could be set up by

the obligor himself, or by his representative, against the obligee, or whoever might hold the bond as assignee or otherwise. It is an equity existing between the parties, which will be recognized and enforced in a court of law, and will follow the obligation into whosesoever hands it may pass, either by the operation of law or the will of the parties. It is not a set-off, but a legal and equitable defence against the claim sought to be enforced for so much as the services rendered amount to. See the cases cited in 3 *Harr*. 227, *Cumberland Bank* v. *Hann*.

If payments of money were made by Samuel King to Benjamin King, or services rendered, or board and lodging furnished, under an agreement that they should be applied to the satisfaction of this bond and mortgage, or under circumstances from which the court may infer such an understanding, it is a good defence in equity for the obligor, or for any one else against whom it may be sought to enforce the payment of the debt.

It would be a great hardship, if such a defence in a case like this was not available.

These services were rendered, it is alleged, from the year 1839 to the year 1847, upon the understanding they were to be credited in reducing the debt on the bond. If no allowance can be had for them here, a suit at law must be brought, and the statute of limitations will be a good defence to three-fourths of the claim. The obligor and those claiming under him, have quietly reposed under the supposition that the bond debt was reduced by the services rendered, and now, when they claim the credit, they are told it is an independent, disconnected debt, and redress must be sought, where it cannot be obtained, in a suit at law. Independently of the statutes of set-off, courts of equity, in virtue of their general jurisdiction, are accustomed to grant relief in all cases where, although there are mutual and independent debts, yet there is a mutual credit between the parties, founded, at the time, upon the existence of some debt due by the crediting party to the other. By mutual credit, in the sense in which the terms are here used, we are to understand a knowledge on

both sides of an existing debt due to one party, and a credit by the other party, founded on and trusting to such debt, as a means of discharging it.   *S. E. J.* 1435.

There is no difficulty arising from the nature of this suit. It is for a decree of sale of the mortgaged premises to pay so much of the debt as may, upon account, be ascertained to be due, and in taking that account all proper allowances should be made.

I think there is no difficulty, as far as the law of the case is concerned, that the defence set up is available in this suit. The only remaining question is, does the evidence support it ?

It is not necessary that any express agreement should be proved ; it may be inferred from circumstances.   This was admitted in the case of *Green* v. *Storm,* 3 *Sandf. Ch. Rep.* 308.   The suit was brought for sale of mortgaged premises. The defence was payment.   The defence failed, because it turned out to be a mere legal set-off for money which had been advanced while the mortgage was in other hands, and for different purposes.

In *Jeff* v. *Wood and others,* 2 *P. Wms.* 128, the Master of the Rolls says: " It is true, stoppage is no payment at law, nor is it, of itself, a payment in equity ; but then a very slender agreement for discounting or allowing the one debt out of the other will make it a payment, because this prevents circuity of action and multiplicity of suits, which is not favored in law, much less in equity."   And again : " It seems that the least evidence of an agreement for stoppage will do ; and in these cases, equity will take hold of a very slight thing to do both parties right."   And it is still more reasonable, that where the matter of the mutual demand is concerning the same thing, then the court should interpose and make the balance only payable.

Let us now look at the evidence we have of an agreement between the obligor and obligee, that the board, lodging, &c., furnished the obligee should be taken, and considered in payment, as far as it went, of the debt secured by the bond and mortgage.

The bond and mortgage bear date the sixth day of April,

1839. The debt was twelve hundred dollars, payable, with interest, in one year from that date. The obligor and obligee were brothers. There is no evidence whether the consideration of the bond was for money lent, or how the debt was contracted. Samuel was a man of family, and Benjamin a single man. They went into partnership in keeping a public house and garden, at Camden, in 1838, and dissolved on the 20th of March, 1839 ; so that the bond and mortgage bear date eleven days after the dissolution ; but whether the debt, or any part of it, grew out of the partnership transactions, does not appear. The evidence is clear that, from the latter date up to January, 1847, with the exception of six months, while he was at Mr. Cake's, and only lodged at his brother's house, Benjamin boarded, lodged, and had his washing done at his brother Samuel's. There is pretty strong evidence, by two witnesses, that the price agreed upon for board was three dollars a week ; and as to the evidence of the real value, no witness puts it lower than two dollars and twenty-five cents a week. Thus, upon the lowest estimate of the value of the board, &c., and, I think, upon very clear testimony, there was an indebtedness from Benjamin to Samuel of very nearly nine hundred dollars. How was it paid from time to time ? Samuel, soon after the bond was given, turned out an utterly worthless man, doing nothing for the maintenance of his family. His wife, by her industry as a market woman, provided for the support of her husband and her children and the boarding of Benjamin. Did Benjamin do anything towards the support of the family, by advancing money, or in any other way ? Witnesses were sworn, who were on terms of intimacy with the family, visiting them frequently, and sympathizing with Mrs. King in her struggles, and it could hardly be that any considerable aid was furnished by Benjamin in any way, without these witnesses having some knowledge of it. All the proof of any assistance furnished by him during the whole period he was in the family, was providing a meat machine for Mrs. King to use in her market business, and this he himself afterwards sold. If, during this long period of time, Benjamin was in

the habit of doing anything for the maintenance of the family, there must be some witnesses who can establish the fact.

There are two endorsements on the bond, both without date. They are as follows: " Received three hundred dollars of the princi*ple*. $300." " The interest paid up to April 6, 1840." The fair presumption is, that the sum of three hundred dollars principal was paid prior to April 6th, 1840. Had that amount been paid at any subsequent period a part of it would have been credited for interest due. It is fair to presume that the credit was given at a time when there was not anything due for interest on the bond. The testimony of John W. Potts corresponds with this presumption. He says, in a conversation with Benjamin about this payment, he understood from him that it was made some year or eighteen months after the date of the bond. The endorsements bear very much the appearance of having been written at one and the same time. If this be so no part of the credit is for board. There is no credit whatever upon the bond from April 6th, 1840; and it can scarcely be supposed that from this period up to January, 1847, Benjamin paid up from time to time his indebtedness for board, while he had in his hands this obligation, on which nine hundred dollars were due, drawing interest. During this period there is no evidence of any dealings or accounts between the parties, except of the bond and mortgage on one side and the board bill on the other.

In addition to these circumstances, we have the testimony of two witnesses to the declarations of Benjamin King, as to what the understanding of himself and his brother was in reference to the matter. He told John W. Potts that he got nothing from his brother except what he boarded out, and that he was boarding with him on account of the claim he held against his property; that his board and lodging were in payment of his claim against Samuel so far as it went. He told him in several conversations he would not have boarded there had it not been for this claim; and he says he heard him tell others the same thing. I have

not overlooked the circumstances, adverted to on the argument, as questioning the accuracy of this witness. But I can see nothing in his conversation, with Mr. Mulford or with the administrator, which the witness himself details with great frankness, going to weaken the force of this part of his testimony. These conversations only show, that until Mr. Mulford was advised with, the witness did not know that these credits could be made available if the administrator refused to allow them. He said nothing inconsistent or irreconcilable with the evidence he gave before the master.

Jeremiah Carter, another witness, says that at one time, in a conversation with him, Benjamin was complaining of the treatment of the children towards him. " I asked him why he boarded there then, or said to him, I would not board there then, or something to that effect; he said he would not, but that he held a bond and mortgage against Samuel for, I think he said, twelve hundred dollars, or something like that amount. He said he boarded there on that account, and signified that he did not expect to get anything except what he boarded out."

Now, upon this evidence, and under these circumstances, is it not equitable and right, that whatever may be due for board and lodging should be credited on this bond and mortgage? Is it not reasonably clear that it was the understanding of the parties that the board and lodging were furnished on account of this debt? And if they were, why ought not the credit to be allowed on it?

I have examined, with great care, all the objections that were very ably urged on the argument, in opposition to the view I have taken of the case.

As to the agreement as set up in the answer, it was objected, it was not proved in the terms, as alleged and set out in the answer. In addition to what I have said, as to the agreement being expressed or implied, I would observe that the same strictness of proof is not required in a case like this as in a case for specific performance, where the very terms of the agreement or contract are necessary to be

ascertained, in order to obtain a decree. It is a general rule that the substance only of the issue need be proved ; nor is it necessary that the same degree of accuracy should be observed in an answer as is required in a bill. 1 *Barb. Ch. P.* 138 ; 2 *Dan.* 244 ; *Gresley's Eq. Ev.* 167.

An allegation of payment in chancery pleading is sufficiently sustained by a proof of satisfaction of the demand in any way, as by set-off, accord and satisfaction, &c. *Lee* v. *Beatty*, 8 *Dana* 212.

It is true there must be a correspondence between the *allegata* and *probata*. I think there is, substantially, a correspondence in this case.

As to the statute of limitations, I do not think it can be interposed to any part of this defence. If a payment of money had been made ten years ago on this debt, and not credited on the bond, the obligor, or those defending under him, would not be debarred by the statute from the benefit of the payment. Besides, there was an open, mutual, running account between these parties as to these specific demands.

Nor can I see how the statute of frauds and perjuries can be made applicable, on the ground that this was an agreement not to be performed in one year from the making thereof. The services have been rendered and accepted, and compensation is claimed, and the simple question now is, whether compensation is to be applied to this particular debt under the agreement of the parties, and not whether the execution of an agreement is to be enforced which was not to be performed within a year. The matter in controversy is not in reference to an executory, but an executed agreement.

I have not overlooked the fact that a fair inference may be drawn from the whole evidence, that there is a considerable sum still due on this bond and mortgage. That may all be true, and yet I do not see that it militates against the conclusion that there was a large amount due from Benjamin to Samuel for board and lodging, and which, by the understanding of the parties, ought to be credited on this

debt.   The matter was allowed to run on during Samuel's life without any settlement, and although Benjamin lived nearly two years after Samuel's death, it does not appear he took any steps to collect the bond or to adjust what was due upon it.   I think we may judge, from Benjamin's conduct, for he never appears to have treated his brother or family harshly as to this claim, that had a settlement been made in his lifetime, this whole matter would have been adjusted without difficulty.

A reference must be had to a master to take the accounts.

*First.* Of what is due for principal and interest on the bond and mortgage, allowing the credits endorsed.

*Second.* An account of what is due for board, lodging and services rendered to Benjamin, during such of the period as the board, &c., were furnished him—from the fifth day of September, 1839, to the first day of January, 1847—and in taking this latter account, let the master make all just and proper allowances for payment in money, or services rendered, or provisions furnished the family by Benjamin. The amount to be allowed for board, &c., will be such sum per week, or month, as they shall be proved to the satisfaction of the master to have been reasonably worth, unless some specific sum shall be proved to have been agreed upon.